UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PAUL THOMPSON,

                              **Plaintiff,**

v.                                               9:19-CV-918 (NAM/DJS)

STEVEN BULLIS and
MATTHEW WALDRON,

                              **Defendants.**
_____

**APPEARANCES:**

Warren S. Landau
448 West Broadway
Cedarhurst, NY 11516
*Attorney for Plaintiff*

Christopher J. Hummel
Assistant Attorney General, of Counsel
Attorney General of the State of New York
The Capitol
Albany, NY 12224
*Attorney for Defendants*

**Hon. Norman A. Mordue, Senior District Court Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

    Plaintiff Paul Thompson brings this action under 42 U.S.C. § 1983 alleging civil rights claims arising out of an incident that occurred on July 30, 2016 at the Clinton Correctional Facility Annex, where he was an inmate. (Dkt. No. 1). Defendants Steven Bullis and Matthew Waldron, current or former employees of the facility, now move for partial summary judgment. (Dkt. No. 45). Plaintiff opposes the motion, and Defendants have replied. (Dkt. Nos. 51–52). Defendants' motion is granted in part and denied in part, for the reasons that follow.

## II. BACKGROUND[1]

On July 30, 2016, Plaintiff was incarcerated at the Clinton Annex and became involved in a physical altercation with Defendant Waldron, a corrections officer there. (Dkt. No. 45-1, ¶ 1). The facts of the incident are disputed, as described below. That day, Defendant Waldron prepared a misbehavior report charging Plaintiff with six infractions: 1) assault on staff; 2) violent conduct; 3) creating a disturbance; 4) unauthorized exchange; 5) refusing a direct order; and 6) being out of place. (Dkt. No. 45-3, p. 17). Plaintiff received the misbehavior report on July 31, 2016. (Dkt. No. 45-1, ¶ 3). Defendant Waldron also prepared and/or contributed to Unusual Incident/Use of Force reports, which stated that Plaintiff punched him in the face and that Defendant Waldron struck Plaintiff once in the arm with a baton. (Dkt. No. 45-3, pp. 72–93). After the incident, Plaintiff was moved to the Special Housing Unit ("SHU") at the Clinton Main, a separate facility from the Clinton Annex. (Dkt. No. 45-1, ¶ 4; Dkt. No. 51, ¶ 10).

At the Clinton Main, Plaintiff drafted and mailed two grievances dated August 1, 2016. (Dkt. No. 45-2, pp. 19–22). Plaintiff alleged that on July 30, 2016, Defendant Waldron physically and sexually assaulted him. (*Id.*). Specifically, Plaintiff states that while leaving the shower area, Defendant Waldron attacked him without provocation, struck him three times with a baton, and grabbed his genitals. (Dkt. No. 51, ¶¶ 3–4).

Defendant Bullis, a Commissioner's Hearing Officer with the Department of Corrections and Community Supervision ("DOCCS"), was assigned to conduct a Tier III disciplinary hearing with respect to the misbehavior report lodged against Plaintiff. (Dkt. No. 45-1, ¶ 6). Before the hearing, Plaintiff elected to have an assistant, and Assistant T. Ryan was assigned to

---

[1] This case was reassigned to the undersigned on October 17, 2022. (Dkt. No. 53). The facts herein have been drawn from Defendants' Statement of Undisputed Facts (Dkt. No. 45-1), Plaintiff's Response, (Dkt. No. 51-10), and the parties' attached exhibits to the extent that they are in admissible form.

2

help Plaintiff with his defense. (*Id.*, ¶ 7). The assistant is a facility employee who can aid an inmate in identifying potential witnesses and obtaining evidence for the hearing. (*Id.*, ¶ 8). Assistant Ryan first met with Plaintiff on August 3, 2016. (*Id.*, ¶ 9).

On August 4, 2016, Defendant Bullis began the hearing. (Dkt. No. 45-1, ¶ 10). Defendant Bullis informed Plaintiff of the charges against him and his right to present evidence and witnesses in his defense. (*Id.*, ¶ 11). Plaintiff requested copies of the Unusual Incident Report, Use of Force Report, internal memos, injury reports, photographs, logbooks, and video from fixed cameras in the area of the incident, as well as video of Plaintiff's escort to the medical unit following the incident. (*Id.*, ¶ 12). The hearing was adjourned to permit Plaintiff an opportunity to obtain further assistance. (Dkt. No. 45-4, p. 4). Defendant Bullis informed Plaintiff that "the purpose of the assistant is to make sure you get everything you're entitled to receive associated with this case," and that Plaintiff could have potential witnesses listed on his "assistant form." (*Id.*, pp. 6–7).

Initially, Plaintiff complained that he was having difficulty identifying all of the inmates housed in the area of the incident who could be potential witnesses and indicated that he wanted to have inmate witnesses interviewed prior to determining whether to call them as a witness. (Dkt. No. 45-1, ¶ 19). Defendant Bullis obtained a list of inmates and informed Plaintiff that, prior to deciding whether he wanted to call a potential witness, he could have them interviewed by providing written questions. (*Id.*, ¶¶ 20, 22).

The hearing began again on September 12, 2016, at which time Plaintiff had received most of the documentary evidence and photographs requested. (Dkt. No. 45-4, pp. 8–10). Plaintiff complained that his assistant had not provided written questions to some potential witnesses outside his current facility. (*Id.*, p. 15). Defendant Bullis stated that Plaintiff's questions would be mailed to potential inmate witnesses in different facilities. (*Id.*, p. 16).

3

Plaintiff had received written statements from five inmates. (*Id.*, p. 18). Plaintiff stated that he wanted his assistant to interview additional inmates. (*Id.*, p. 22). On September 20, 2016, the hearing resumed and Plaintiff again stated that he wanted written statements from certain inmates (Gomez, Rivera, Gilmore, Cruz, and Harrell) before deciding to call them as witnesses. (*Id.*, pp. 28–29). Plaintiff complained that his assistant had only asked these inmates if they were willing to testify. (*Id.*, p. 32). Defendant Bullis stated that Plaintiff's request would be forwarded to the disciplinary office. (*Id.*, p. 33).

On October 3, 2016, the hearing resumed, and Plaintiff complained that his assistant had "not done anything." (Dkt. No. 45-4, pp. 38, 44). Plaintiff said that he had not seen or heard from his assistant since the last date. (*Id.*, p. 48). Plaintiff said that his assistant had failed to pick up the written questions to be provided to potential inmate witnesses. (*Id.*). Plaintiff states that, at this point, his assistant had "effectively disappeared and abandoned his assignment." (Dkt. No. 51, ¶ 13). Defendant Bullis said that he would relay Plaintiff's request for assistance to the disciplinary office. (Dkt. No. 45-4, pp. 48–50). Testimony was heard from the medical unit's Registered Nurse Cherrier. (*Id.*, p. 52). On October 11, 2016, the hearing continued with testimony from Corrections Officer King, who was not present for the incident. (*Id.*, p. 61). Sergeant Pulsifer also testified and said that Plaintiff was already handcuffed when he arrived. (*Id.*, p. 81). Defendant Bullis viewed with Plaintiff portions of the video from Plaintiff's escort. (*Id.*, p. 69). Plaintiff said that he wanted to call two inmate witnesses, Cruz and Harrell, because he was "tired of waiting" for statements from the rest of the inmates. (*Id.*, p. 74).

On October 13, 2016, the hearing continued with testimony from Corrections Officer Drollette, who said he saw Plaintiff struggling with Defendant Waldron and that he did not witness any assault on Plaintiff. (Dkt. No. 45-4, pp. 91–92). Later, Defendant Bullis told Plaintiff that inmate Cruz had declined to testify. (*Id.*, p. 101). Plaintiff then requested to have

4

inmate Gilmore testify. (*Id.*, p. 109). Plaintiff stated that his written questions had not been provided to inmate Gilmore. (*Id.*, pp. 108, 113). After further discussion, Plaintiff withdrew his request for inmate Gilmore to testify because he did not want to decide whether to call inmate Gilmore as a witness until he had been provided with Plaintiff's written questions. (*Id.*, pp. 111–12). Defendant Bullis advised Plaintiff that he would contact the disciplinary office about getting his questions to inmate Gilmore. (*Id.*, p. 114).

On October 19, 2016, the hearing resumed with testimony from inmate Harrell, who said that Defendant Waldron attacked Plaintiff without provocation. (Dkt. No. 45-4, pp. 115–18). Lieutenant Snow and Deputy Superintendent of Security Holdridge testified that no fixed cameras existed in the area of the incident and that one of the three DVDs from the escort video was inoperable. (*Id.*, pp. 119–29). On October 24, 2016, Defendant Waldron testified that Plaintiff refused orders and approached him with closed fists in a "very aggressive manner," at which point Plaintiff struck Defendant Waldron in the face with a closed fist, breaking his nose. (*Id.*, pp. 144–46). Defendant Waldron said that he struck Plaintiff once with a baton, at nearly the same moment that Plaintiff struck him. (*Id.*, pp. 156–57).

Later on October 24, 2016, the hearing concluded and inmate Gilmore did not testify. (Dkt. No. 45-4, p. 174). According to the transcript, Defendant Bullis stated that Plaintiff had withdrawn his request for inmate Gilmore to testify and that all witnesses requested had been addressed, and Plaintiff responded, "Alright." (*Id.*). Defendant Bullis asked Plaintiff if there was anything else he wanted to say, and Plaintiff made several objections. (*Id.*, pp. 176–79). Among other things, Plaintiff said that he did not receive proper assistance, he complained about inmate Cruz's failure to testify, and he claimed that Defendant Bullis was biased and interfered with his questioning. (*Id.*). Defendant Bullis stated that he had addressed all of Plaintiff's "assistant issues," but Plaintiff disagreed. (*Id.*, p. 176).

5

Ultimately, Defendant Bullis found Plaintiff guilty of assault on staff, violent conduct, creating a disturbance, and refusing a direct order; Defendant Bullis stated that these charges were corroborated by the credible testimony of the witnesses, as well as the documentary and photographic evidence. (Dkt. No. 45-4, pp. 182–83). As punishment, Defendant Bullis imposed the following penalties: 205 days of SHU confinement, loss of packages, loss of commissary, and loss of phone privileges. (*Id.*, p. 184). Plaintiff states that he experienced many hardships while in SHU confinement. (Dkt. No. 51, ¶¶ 35–43).

## III. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). Further, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and the grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing *Dister v. Continental Grp., Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988)).

6

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case." *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003). To that end, "sworn statements are more than mere conclusory allegations subject to disregard [ ]; they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion." *Id.* at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

## IV. DISCUSSION

Plaintiff alleges three claims: 1) excessive force in violation of the Eighth Amendment, as against Defendant Waldron; 2) retaliation in violation of the First Amendment, as against Defendant Waldron; and 3) violation of the right to due process under the Fourteenth Amendment, as against Defendant Bullis. (Dkt. No. 1). Defendants seek summary judgment on Plaintiff's retaliation and due process claims. (Dkt. No. 45-5). In response, Plaintiff argues that there are issues of fact as to his due process claim. (Dkt. No. 51-2, p. 15). However, Plaintiff does not oppose dismissal of his retaliation claim, (*id.*, p. 28), which will be dismissed.

### A. Applicable Law

In general, to sustain a Section 1983 procedural due process claim, the plaintiff must demonstrate that he possessed a protected liberty or property interest and that he was deprived of that interest without due process. *See Bedoya v. Coughlin*, 91 F.3d 349, 351–52 (2d Cir. 1996). "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate

7

in relation to the ordinary incidents of prison life.'" *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (*quoting Sandin v. Conner*, 515 U.S. 472, 484 (1995)).

With respect to a disciplinary hearing involving a liberty interest, due process requires: 1) advance written notice of the charges; 2) the opportunity to call witnesses and present documentary evidence, subject to legitimate safety and correctional goals of the institution; 3) that the inmate be judged by a fair and impartial hearing officer; and 4) that the decision be in writing, with reasons identified for the disciplinary action taken, and be supported by at least some evidence. *See Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999) (internal quotations omitted) (citing, inter alia, *Wolff v. McDonnell*, 418 U.S. 539, 563–67 (1974)).

In addition, prison officials "have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir. 1988). "When the inmate is disabled, either by being confined full-time to SHU or transferred from the prison in which the incidents occurred, the duty of assistance is greater because the inmate's ability to help himself is reduced." *Id*. Thus, an inmate in SHU confinement is entitled to an "assistant" who can help gather evidence, obtain documents, review videos, and interview witnesses. *Id.* at 898. "At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself." *Id.*

Assuming the plaintiff demonstrates some defect in the process of his disciplinary hearing, he must also show that he was prejudiced. *See Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991) (stating that the outcome of a disciplinary hearing should not be overturned due to a procedural error "without making the normal appellate assessment as to whether the error was harmless or prejudicial"). In other words, the plaintiff must show that the alleged defect in due process affected the outcome of his disciplinary hearing and was not harmless.

8

B. Analysis

First, Defendants argue that "[t]he sanctions imposed against Plaintiff, 205 days SHU confinement, loss of packages, loss of commissary, and loss of phone use, do not amount to a liberty interest." (Dkt. No. 45-5, p. 13). However, Plaintiff has adduced evidence that while in SHU confinement for more than half a calendar year, he experienced serious hardships including isolation, sensory deprivation, lack of exercise, inferior food, interference with his religious activities, and reduced access to legal resources—all of which caused him anxiety and depression. (Dkt. No. 51, ¶¶ 35–43). The Court finds that this evidence is sufficient to raise an issue of fact as to whether Plaintiff experienced an atypical and significant hardship in relation to the ordinary incidents of prison life, thus implicating a liberty interest. *See Welch v. Bartlett*, 196 F.3d 389, 394 (2d Cir. 1999) (finding that questions of fact as to SHU confinement precluded summary judgment on the plaintiff's due process claim).

The next question is whether Plaintiff was deprived of due process. Defendants argue that Plaintiff received all the process that he was due. (Dkt. No. 45-5, p. 14). In response, Plaintiff claims that: 1) he received inadequate assistance from his assistant to mount a defense and Defendant Bullis failed to address the problem; and 2) Defendant Bullis interfered with Plaintiff's ability to examine witnesses. (Dkt. No. 51-2, pp. 6–11).

1. Inadequate Assistance

Defendants assert that Defendant Bullis "appropriately addressed all of Plaintiff's requests for documentary evidence and videos made to his assistant and concerns with the effectiveness of his assistance in obtaining written statements from potential inmate witnesses." (Dkt. No. 45-5, p. 15). In response, Plaintiff contends that Defendant Bullis failed to address Plaintiff's repeated complaints that his assistant had failed to obtain written statements from potential inmate witnesses. (Dkt. No. 51-2, p. 24).

9

As an initial matter, because Plaintiff was in SHU confinement, it was necessary for him to rely on an assistant to help prepare his defense by doing what he could not, including interviewing witnesses. It was also incumbent upon Defendant Bullis to address any deficiencies in that assistance. Early on, Plaintiff's assistant obtained statements from five potential inmate witnesses. (Dkt. No. 45-4, p. 18). But on September 20, 2016, Plaintiff complained that he had not received written statements from inmates Cruz, Gomez, Rivera, and Gilmore. (*Id.*, p. 29). On October 3, 2016, Plaintiff said that he had not heard from his assistant, who failed to pick up the questions for potential inmate witnesses. (*Id.*, p. 48). According to Plaintiff, his assistant had "effectively disappeared and abandoned his assignment." (Dkt. No. 51, ¶ 13). On October 13, 2016, Plaintiff stated that his questions still had not been delivered to inmate Gilmore. (Dkt. No. 45-4, pp. 111–12).

Defendant Bullis states that, after October 13, 2016, "Plaintiff never informed me that he had not received responses to questions from Gilmore, or any other deficiency with the assistance he received regarding his ability to evaluate whether to call Gilmore as a witness." (Dkt. No. 45-3, p. 11). But Plaintiff states that on the last day of the hearing, October 24, 2016, he protested that "DOCCS had interfered with my ability to interview Gilmore" and that his assistant never obtained answers to Plaintiff's written questions for inmates Gilmore, Cruz, and Gomez. (Dkt. No. 51, ¶ 20). The transcript of the hearing that day is not entirely clear.[2] In one place, Plaintiff appears to admit that he had withdrawn his request for inmate Gilmore to testify. (Dkt. No. 45-4, p. 174). At another point, Plaintiff referenced witnesses and objected that his assistant failed to do what was asked of him. (*Id.*, p. 177).

---

[2] The transcript of the hearing is unclear in some sections which are described as "inaudible." Thus, it does not contain a complete and accurate account of the proceeding, and any ambiguities must be viewed in the light most favorable to Plaintiff.

Based on the above, the Court finds that Plaintiff has raised an issue of material fact as to whether Defendant Bullis denied Plaintiff adequate assistance to defend himself at the disciplinary hearing. At least twice, Plaintiff complained to Defendant Bullis that his assistant had failed to secure written statements from witnesses, and Defendant Bullis responded vaguely that he would follow up with the disciplinary office. (Dkt. No. 45-4, pp. 29, 33, 48–50). Notably, Defendants have not submitted any statement from Plaintiff's assistant, nor anyone to explain the workings of the disciplinary office. Moreover, while Defendants claim that Plaintiff failed to alert Defendant Bullis to continued problems obtaining a statement from inmate Gilmore, Plaintiff states that he raised the issue again on the final day of the hearing, (Dkt. No. 51, ¶ 20), and the "inaudible" gaps in the transcript must be construed in Plaintiff's favor. (*See, e.g.*, Dkt. No. 45-4, p. 176). Therefore, viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendant Bullis was put on notice that Plaintiff's assistant was not doing enough to help him prepare a defense, particularly with respect to getting a statement from inmate Gilmore, and Defendant Bullis responded by passing the buck and/or ignoring the problem.

### a. Prejudice

Having raised an issue of fact as to a defect in the process of the disciplinary hearing, Plaintiff must also demonstrate that he was prejudiced. Defendants argue that Plaintiff "cannot demonstrate that testimony from any of the inmate witnesses he wanted to present at the hearing would have affected the outcome of the hearing." (Dkt. No. 45-5, p. 20). In response, Plaintiff contends that "the due process violation in failing to ensure that [he] . . . had an operating assistant of his choosing clearly impaired plaintiff's ability to prepare his defense." (Dkt. No. 51-2, p. 26). Specifically, Plaintiff claims that he was prejudiced by his assistant's failure to interview inmate Gilmore, who would have been a favorable witness. (*Id.*).

11

In support, Plaintiff has submitted trial testimony from inmate Gilmore in a Court of Claims action Plaintiff brought against the State of New York. (Dkt. No. 51-9). In that trial, inmate Gilmore testified that he witnessed the incident between Plaintiff and Defendant Waldron on July 30, 2016. (*Id.*, p. 14). Inmate Gilmore testified that Defendant Waldron started the altercation, struck Plaintiff multiple times with a baton, and that Plaintiff only tried to defend himself. (*Id.*, pp. 15–24).

Defendants argue that inmate Gilmore's testimony "would not have materially increased the probability that Defendant Bullis would have reached a different conclusion at the end of the hearing regarding Plaintiff's commission of the disciplinary infractions." (Dkt. No. 52, p. 6). However, inmate Gilmore's testimony supports Plaintiff's version of events in important respects, and the Court cannot conclude that it would have made no difference to the outcome of the hearing, which is a delicate question of balancing evidence best left to a jury. Thus, Defendants are not entitled to summary judgment on this basis.

**b. Qualified Immunity**

Next, Defendants argue that Defendant Bullis is entitled to qualified immunity against Plaintiff's due process claim related to inadequate assistance. (Dkt. No. 45-5, p. 21). Specifically, Defendants assert that "Defendant Bullis could not have contemplated that his efforts to address Plaintiff's concerns regarding the effectiveness of his hearing assistant with the disciplinary office were nevertheless constitutionally deficient even when Plaintiff failed to alert him to the purported continuing failure of the assistant to provide the requested assistance." (*Id.*, pp. 21–22).

In general, qualified immunity "protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action

12

did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007)); *see also generally Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Where the relevant facts are not in dispute, the Court can decide qualified immunity as a matter of law. *See Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990).

Here, the Court cannot find that Defendant Bullis is entitled to qualified immunity because relevant facts remain in dispute, namely whether he was on notice of the continued failure of Plaintiff's assistant to help him prepare a defense, and what exactly Defendant Bullis did in response. It is clearly established that an inmate's due process rights are violated when his assistant fails to provide any assistance. *See Eng*, 858 F.2d at 898. Therefore, assuming Defendant Bullis was aware that Plaintiff's assistant had failed to interview potential witnesses and that Defendant Bullis failed to address the problem, he could not have believed that his actions (or inaction) were objectively reasonable and/or did not violate clearly established law. *See Ayers v. Ryan*, 152 F.3d 77, 82 (2d Cir. 1998) (finding that the defendant hearing officer was not entitled to qualified immunity where he did not provide assistance to the plaintiff inmate in a disciplinary hearing).

### 2. Examination of Witnesses

Plaintiff also argues that, throughout the disciplinary hearing, Defendant Bullis interfered with Plaintiff's ability to effectively examine witnesses. (Dkt. No. 51-2, pp. 24–25) (citing Dkt. No. 51, ¶¶ 21–32). But it is well-established that an inmate does not have a constitutional right to confront or cross-examine witnesses in a prison disciplinary hearing. *See Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993) (citing *Wolff*, 418 U.S. at 567–68). "While inmates do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials." *Rivera v. Wohlrab*, 232 F. Supp. 2d 117, 125 (S.D.N.Y. 2002).

After careful review of the record, the Court finds that there is no rational basis to conclude that Defendant Bullis deprived Plaintiff of his due process rights regarding examination of witnesses. Plaintiff was able to question numerous witnesses, including Defendant Waldron. At various points, Defendant Bullis interrupted Plaintiff, asked him why he was asking certain questions, and properly reminded Plaintiff that he did not have the right to cross-examine witnesses; Defendant Bullis limited questioning to what he thought was relevant. (*See, e.g.*, Dkt. No. 45-4, pp. 96–100, 157–58). Although Plaintiff claims that Defendant Bullis interfered with his questioning (allegedly tipping Plaintiff's hand as to his defense strategy), a disciplinary hearing is not a court of law and inmates are not permitted to play Matlock. Rather, it is a narrow fact-finding inquiry where inmates have significant but necessarily limited rights. The record shows that Plaintiff was allowed to extensively question his witnesses, both personally and through Defendant Bullis. To the extent Defendant Bullis declined to ask some of Plaintiff's questions or rephrased them in a more direct way, the record shows that he justified doing so and acted within his discretion as the hearing officer.

Ultimately, a jury could only find that Defendant Bullis acted reasonably to keep the hearing on track and on topic—the merits of the misbehavior report. Therefore, Defendant Bullis is entitled to summary judgment on this portion of Plaintiff's due process claim.[3] *See also Murray v. Arquitt*, No. 10 Civ. 1440, 2014 WL 4676569, at *18, 2014 U.S. Dist. LEXIS 68665, at *42 (N.D.N.Y. Sept. 18, 2014) (dismissing the inmate's due process claim, where among other things, the hearing officer provided reasons for not permitting the inmate to ask certain questions, such as lack of relevance to the merits of the misbehavior report at issue).

---

[3] Alternatively, even assuming that Defendant Bullis interfered with Plaintiff's ability to personally examine witnesses, the Court finds that it was objectively reasonable for Defendant Bullis to believe that doing so did not violate Plaintiff's clearly established due process rights, and therefore, Defendant Bullis would be entitled to qualified immunity on this portion of Plaintiff's due process claim.

V. **CONCLUSION**

For these reasons, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 45) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Plaintiff's First Amendment Retaliation claim against Defendant Waldron is **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff's Fourteenth Amendment Due Process claim against Defendant Bullis related to examination of witnesses is **DISMISSED with prejudice**; and it is further

**ORDERED** that Defendants' motion is **otherwise DENIED**; and it is further

**ORDERED** that the following claims shall proceed to trial: 1) Plaintiff's Eighth Amendment excessive force claim against Defendant Waldron; and 2) Plaintiff's Fourteenth Amendment due process claim against Defendant Bullis related to inadequate assistance; and it is further

**ORDERED** that the Clerk of the Court is directed to provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

Date: November 18, 2022
Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge